594 NASHVILLE:

State *ex rel.* Gaines *v.* Whitworth.

THE STATE OF TENNESSEE *ex rel.* JAS. L. GAINES *v.* GEORGE K. WHITWORTH, Trustee.

1. CONSTITUTIONAL LAW. "No bill shall become a law, which embraces more than one subject; that subject to be expressed in the title. All acts which repeal, revive or amend former laws, shall recite in their caption or otherwise the title or substance of the law repealed, revived or amended." Sec. 17, art. 2, of the Constitution construed.

2. MANDAMUS. *Revenue collectors.* A *mandamus* is the more efficient and appropriate remedy to compel the collectors of public revenue to proceed and perform their duties.

3. TAXATION. *Exemption.* Though a Legislature may, under constitutional provisions, exempt property from taxation, not only during the period of its existence, but so as to be beyond the control of the taxing power of succeeding Legislatures, the intention to grant this immunity must be clear beyond a reasonable doubt. Property exempted in the hands of an individual or corporation will not be exempt in the hands of a purchaser unless clearly so provided. Lands donated by the State to an educational institution and exempt from taxation for ninety-nine years, are not exempt in the hands of purchasers from such institutions.

4. SUPREME COURT DECISION. *Law of property.* A decision of the Supreme Court long acquiesced in, and which has established a rule of property, should not be reversed, though incorrect.

FROM DAVIDSON.

Appeal in error from the Circuit Court of Davidson county. FRANK T. REID, J.

Judges COOPER and TURNEY being incompetent, Special Judges T. M. JONES and JOHN V. WRIGHT were commissioned and were of the court who heard this cause.

A. S. COLYAR & SON, FRANK SLEMONS, J. W. BA-
KER and FLOYD ESTELL for relator.

DEMOSS & MALONE, R. McPHAIL SMITH and JOR-
DAN STOKES, Jr., for defendants.

T. M. JONES, Special J., delivered the opinion of
the court.

State of Tennessee, on the relation of James L.
Gaines, comptroller of the State, filed a petition in the
circuit court of Davidson county, for a *mandamus* to
compel the trustee of Davidson county to assess and
collect the taxes upon certain town lots and the im-
provements thereon, located in the city of Nashville,
and known as the "free territory," and which the
petition alleges "by mistake of law or facts, or per-
haps by both, had not been taxed."

It is insisted by the counsel for the plaintiff in
error, that the act of 1879, upon which this proceed-
ing is based, is unconstitutional, because it comes in
conflict with the 17th section of the 2d article of the
Constitution, which is in the following words: "No
bill shall become a law, which embraces more than
one subject; that subject to be expressed in the title.
All acts which repeal, revive, or amend former laws,
shall recite in their caption, or otherwise, the title or
substance of the law repealed, revived or amended."

It is insisted:

1st. That this act is merely an amendment of the
general revenue act of March 9th, 1877, and yet does
not recite the title or substance of that act.

2d. Its title does not express its subject. It is entitled "An act for the more rigid collection of the revenue," when it should be in the plural, as the act embraces three revenues, to-wit, State, county and municipal.

3d. That it embraces more than one subject, to-wit: assessment—collecting three separate and distinct revenues—the increase of the jurisdiction of justices—the regulation of the practice before them, etc.

The construction of this provision of the Constitution of 1870, came before the Supreme Court of Tennessee in about two years after its adoption. In an opinion delivered by Chief Justice Nicholson, who was a distinguished member of the convention which framed the Constitution, he says: "The convention evidently designed to *cut up by the roots,* not only the pernicious system of legislation, which embraced in one act incongruous and independent subjects, but also the evil practices of giving titles to acts which conveyed no real information as to the objects embraced in its provisions." In that opinion he quotes with approbation from Judge Cooley, in his able work on Constitutional Limitations, that "the general purpose of these provisions is accomplished when a law has but one general object, which is fairly indicated by its title. To require every end and means necessary or convenient for the accomplishment of this general object, to be provided for by a separate act relating to that alone would not only be unreasonable, but would actually render legislation impossible." "The generality of a title is no objection to it, so long as it is not made a

cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The Legislature must determine for itself how broad and comprehensive shall be the object of the statute, and how much particularity shall be employed in the title in defining it." The learned judge says: " We concur in these general views as *sound* and *practical,* and by them the validity of the act in question must be tested": 8 Heis., 519. And he announced as the conclusion of the court, " that any provision of an act directly or indirectly relating to the subject expressed in the title, having a natural connection therewith, and not foreign thereto, should be held to be embraced in it." The title of the act in that case was, " An act to fix the State tax on property," and the court held that a provision for a tax on privileges was properly included in the title, and not in conflict with that article and section of the Constitution. The question again came before the Supreme Court of Tennessee, in the case of *Luehrman* v. *The Taxing District,* 2 Lea, 426. Judge Cooper, who delivered the opinion of the supreme court, says: " Under a similar provision in the Constitution of other States to the one quoted, it has been uniformly held, that only the general or ultimate object of the act need be stated in the title, and not the details by which that object is to be attained;" and quoting from Judge Cooley, in his work to which reference has already been made, says: " There has been a general disposition to construe these constitutional provisions liberally, rather than to embarrass legislation by

a construction whose strictness is unnecessary to the accomplishment of the beneficial purposes for which it has been adopted." Accordingly the court held in that case that an act entitled, "A bill to establish Taxing Districts in this State and to provide the means for the local government of the same," which grants municipal franchises to the communities within the territorial limits of the Taxing District, and gives to the corporation thus created all the necessary legislative, judicial and police powers of an incorporated city, and contains specifications of offenses against the corporation, or committed by its officials with penalties and punishments, contains only one subject within the meaning of the Constitution. The question again came before the Supreme Court of Tennessee in the case of *Morrell* v. *Fickle,* 3 Lea, 79, in which a majority of the court held that an act entitled "An act to establish a Chancery and Law Court at Bristol in the county of Sullivan," is constitutional. The writer of this opinion has not had the opportunity of examining the opinion of the court in the case of the *State* v. *Bethel,* referred to in the very able argument of the counsel. He has been informed that it is not in conflict with the cases reported in 8 Heiskell and 2 Lea, and the long list of authorities by which those decisions are sustained. The strong and impregnable arguments and reasons by which they are supported, we think, settles the questions therein involved as firmly as they can be settled by judicial decisions.

Let us now test the act in question by the principles laid down in these decisions. The general subject

of the act is revenue. It is entitled an act "for the more rigid collection of the revenue," and each and every section in the act has direct reference to the subject of revenue.

It is true, the act makes all collectors assessors, to assess all property "which by mistake of law or facts has not been assessed," "and proceed to collect the same," and while it is true, as argued by counsel, that "collection is a process beginning after assessment," yet it is equally true that each has reference to the same subject, and the one is the means provided by the act for the attainment of the end expressed in the title, to-wit, "the more rigid collection of the revenue," as it is evident that no taxes could be collected until this assessment was made. The provisions in the act, that suit may be brought for the recovery of these taxes by the issuance of a warrant by a justice of the peace in the name of the State, county and municipal corporations jointly or separately, and giving justices of the peace jurisdiction "to try all such cases, no matter what the amount," is liable to a more serious objection, but we do not deem it necessary to pass upon this provision of the statute, as this proceeding commenced by a petition for a *mandamus* in the circuit court.

If some of the provisions of the act are unconstitutional, because not indicated by the title, or for any other cause, yet it is an universal rule, that so much of the act as is not in conflict with the Constitution must be sustained: Cooley on Constitutional Limitations, 148. Nor do we regard the act before us as

an amendment to the act passed on the 9th of March, 1877. That act is entitled, "an act to amend all laws for the assessment of property." The act of 1879 is, "for the more rigid collection of the revenue." It does not repeal, or change, or modify any provisions of the act of 1877. Its object is, "to assess all property which by mistake of law or facts has not been assessed," and collect the taxes which may be assessed upon the same.

2d. It is also insisted by the counsel for the plaintiff in error, that if the act of 1879 is constitutional and valid, yet, "a *mandamus* will not lie to compel obedience thereto, since there is another adequate remedy by indictment. It is true that by the provisions of the Code, sec. 559 *a*, if a tax collector shall wilfully refuse to value all taxable property in good faith, according to the standard laid down in the Code, he may be indicted for a misdemeanor, and upon conviction punished as other misdemeanors. While it is a fundamental principle, that *mandamus* will not lie where there is any other specific adequate remedy, yet it has been repeatedly decided, that an indictment is not a sufficient and adequate remedy: Moses on Mandamus, page 190; *The People* v. *Mayor of New York*, 10 Wendell, 395; *Rex* v. *Laverne and Rye Railway*, 2 B. & Ald., 646.

A *mandamus* is certainly the more efficient and appropriate remedy to compel the collectors of the public revenue to proceed and perform their duties. For, unless there was some summary process to compel the performance of these duties, the public treasury would

become embarrassed, and great public mischief might ensue: Moses on Mandamus, 139.

Believing, as we do, that the act of 1879 is constitutional and valid, at least all of the provisions of the act, so far as they are applicable to this case, and that a *mandamus* is an appropriate remedy, this brings us to the consideration of the more important question, as to whether the town lots and improvements thereon mentioned in the exhibits to the petition, were at the time the petition was filed, exempt from taxation. In 1785 the State of North Carolina, before her adoption of the Constitution of the United States, and when the State of Tennessee was embraced within her boundaries, incorporated the Davidson Academy.

In 1789 North Carolina ceded the territory of Tennessee to the United States, reserving in the cession act, rights under the grants of the State: 1 vol. Code, page 195.

In 1796, Tennessee was admitted as a State into the Union, and in 1806 incorporated Cumberland College. The preamble of the act reciting that the trustees of the Academy had petitioned that its funds and property be united with and merged into those of the College.

By the 1st section of the act of 1785, the Reverend Thomas Craighead and others were declared "to be a body politic and corporate, to be known and distinguished by the title of the trustees of Davidson Academy," with power "by gift, purchase or devise, to take, have, receive, possess, enjoy and retain to them and their successors forever, any lands, rents, etc." The second section gives the trustees the power "to bargain,

sell, alien and convey any such lands, rents, etc."
The 6th section is in these words: "That no lands,
tenements, or hereditaments which may be vested in
the trustees of the Academy of Davidson, for the sole
use and behoof of the Academy, shall be subject to
any tax for the space of ninety-nine years."

By the 7th section: "Two hundred and forty acres
of the land reserved for the use of the State, being
that part of said land which is most remote from the
salt springs near Nashville, shall be, and is hereby
vested in the trustees of Davidson Academy for the
use of that seminary." It is conceded that all of the
town lots and improvements thereon sought to be taxed
by this proceeding, are located within the boundaries
of this grant of two hundred and forty acres.

By the 6th section of the act incorporating Cum-
berland College, "all of the property, real and per-
sonal, of what kind soever," vested in the trustees of
Davidson Academy, was upon the petition of the trus-
tees of Davidson Academy, vested in the trustees of
Cumberland College, and "all acts establishing or grant-
ing a charter to said Davidson Academy" were repealed,
"except so far as will authorize the collection of the
debts due the said Academy."

The 9th section of the act is in the following words:
"Be it enacted, that all property real and personal,
by this act appropriated and made over for the use
and benefit of said College, and all property of what
kind soever, that may hereafter be given to said Col-
lege by donation, bequest, or otherwise, is hereby de-
clared free of any taxation whatever."

The 10th section made it the duty of the "board of trustees of Davidson Academy to execute deeds of conveyance for the lots by them sold adjoining the town of Nashville, agreeably to the existing laws which were in force at the time of such sale, anything in this act to the contrary notwithstanding."

The principal question in this case arises upon a proper construction of the 6th section of the act of 1785, passed by the Legislature of North Carolina, incorporating Davidson Academy, and the 6th and 9th sections of the act of 1806, incorporating Cumberland College. That the Legislature of a State, unless restrained by its organic law, has the power to exempt from taxation either for a limited time or permanently, property real or personal, when held by trustees for the benefit of her educational institutions, we think is now too well settled to admit of argument: See *Dartmouth College* v. *Woodard*, 4 Wheaton, 637; *Rousa* v. *Home of Friendless*, 8 Wall., 438; *University* v. *People,* 9 Otto, 310.

The power of the State to part with its right to tax this property when it is no longer held by the trustees for the benefit of these institutions of learning, but has been conveyed to third parties, or even to surrender its powers of taxation for an indefinite period, has been seriously questioned by some of our ablest judges: See the dissenting opinion of Judge Miller, in which Chief Justice Waite and Field concurred, in the case of *Washington University* v. *Rousa,* 8 Wallace.

But the weight of authority, we think, has settled

the question in favor of the power: See *New Jersey* v. *Wilson,* 7 Cranch, 164; *McGhee* v. *Mathison,* 4 Wall., 133;. *Humphrey* v. *Pegus,* 16 Wall, 244; *Morgan* v. *Louisiana,* 93 U. S., 217.

While it is true, as has been so well and ably argued, that the power of taxation is the "life blood" of a government, and that it cannot part with all of its powers of taxation, as no government has the right to destroy itself, yet it is equally true that virtue and morality, education and intelligence, are equally necessary for its preservation, and without which no good government, especially no free constitutional government, can long exist. It may be difficult to define the limit as to the power of the Legislature to part with this right of taxation, yet we are content to draw the line, where a long list of well-considered cases of the Supreme Court of the United States, and almost every State in the United States have drawn it, around the school-house and the church, and in some instances where it was necessary to invite capital to build a great highway to carry off the products of a State to the markets of the world.

In the absence of any constitutional provision, the question rests within the sound discretion of the Legislature. In a representative government it was believed that this discretion would not be abused. Even the amended Constitution of Tennessee of 1870, which in article 2, section 28,. says, "all *property,* real, personal or mixed, *shall be taxed,*" vests the Legislature with the discretionary power of exempting without limit as to time, "such property as may be held. by

the State, by counties, cities or towns, and used exclusively for public or corporation purposes, and such as may be held and used for purposes purely religious, charitable, scientific, literary or educational."

The question is not whether the Legislature of North Carolina in 1785, when it incorporated Davidson Academy, or the Legislature of Tennessee in 1806, when it incorporated Cumberland College, had the power to exempt from taxation for ninety-nine years, the town lots and improvements thereon, or the lands embraced within the grant of the two hundred and forty acres vested in the trustees of Davidson Academy, but whether it was the intention of the Legislature, that this exemption should attach to the land and follow it into the hands of purchasers from the trustees. No fair construction can be placed upon the act of 1785, which admits of a doubt, but that it was the intention of the Legislature of North Carolina to exempt from taxation these two hundred and forty acres of land, while held by the trustees for the use and benefit of the Academy, for ninety-nine years; and it is equally free from all doubt, that it was the intention of the Legislature of Tennessee by the act of 1806, which upon petition of the trustees of Davidson Academy, merged "its funds and property" "in those of Cumberland College," and vested "all the property, real and personal, of what kind soever of Davidson Academy," in trustees for the sole use and benefit of said College, to exempt from any taxation whatever," not only that portion of the two hundred and forty acres which had not been sold by the trustees of the

Academy of Davidson county, but all the other prop-
erty, "real and personal," which had been appropriated
by the act, or which might be given to the College,
by donation, bequest or otherwise, not only for the
unexpired term of ninety-nine years, but so long as
the same should be held by the trustees for the sole
use and benefit of the College.

But did the Legislature intend to surrender its
power of taxation of these lands, when they were no
longer held by the trustees for the use and benefit of
the Academy or College, but had been conveyed by
the trustees to *bona fide* purchasers? The record is
silent as to the contemporaneous construction given of
these acts by the State, county, or municipal govern-
ments—whether any taxes were assessed and collected,
or attempted to be assessed and collected upon these
lots before 1836, a construction which has always had
great weight with the courts, and our ablest judges
have hesitated to disturb it: 1 Yer., 360; 2 Head,
320; 7 Heis., 35. The Supreme Court of Tennessee,
in several recent cases, have held the power to tax in
a government involved its power to exist; and a re-
linquishment of the power is not to be presumed un-
less expressed in terms too plainly to be mistaken:
7 Heis., 40, 389; 8 Heis., 388, 456, 663; 9 Heis.,
349.

Justice Field, in the case of *Hoge* v. *Railroad Co.*,
in the Supreme Court of the United States, reported
in 9 Otto, 354, says: "The power of the Legislature
of a State to exempt particular parcels of property of
individuals or corporations from taxation, not merely

during the period of its own existence, but so as to be beyond the control of the taxing power of succeeding Legislatures, has been asserted in several cases in this court, although against the doctrine there have been several earnest protests by individual judges. But though this power is recognized, it is accompanied with the qualification, that the intention of the Legislature to grant the immunity must be clear beyond a reasonable doubt. It cannot be inferred from uncertain phrases or ambiguous terms." "Whoever claims its surrender must show it in language which will admit of no other reasonable construction." "If a doubt arises as to the intent of the Legislature, it must be solved in favor of the State." See also 18 Wallace, 225, in the *Delaware Railroad Case; Tucker* v. *Furgerson,* 22 Wallace, 575; *Erie Co.* v. *Pennsylvania,* 21 Wallace, 498; Cooley on Taxation, 52, and a long list of cases which we deem it unnecessary to cite.

From these high authorities—decisions of the Supreme Court of the United States—recent decisions of our own State and other States, and the principles and rules laid down by standard works, if the construction of the acts before recited was now brought before the Supreme Court of Tennessee for the first time, we would be constrained to hold that neither the Legislature of North Carolina or of Tennessee intended by these acts of incorporation, to surrender its power of taxation of these lands, when they were no longer "vested" in the trustees for the "use and benefit" of these institutions of learning, but had been conveyed to *bona fide* purchasers.

State *ex rel.* Gaines *v.* Whitworth.

The Legislature of North Carolina and of Tennessee had the same great object in view, to-wit, to foster and build up these schools as great educational institutions of the youth of the country, which to use their own language, "has the most direct tendency to promote the virtue, increase the wealth, and extend the fame of any people; and as it is the indispensable duty of every Legislature to consult the happiness of a rising generation and endeavor to fit them for an honorable discharge of the social duties of life." To accomplish this noble object the Legislature intended not only to exempt from taxation for ninety-nine years the two hundred and forty acres of land vested in the trustees, so long as it was held by them for the use of the Academy, but also to hold out inducements to a generous public to make donations for the same object; and although the argument is plausible, that to enhance the value of these lands and thereby increase the endowment fund, the Legislature intended to attach the exemption to the lands, yet it is not expressed, as now held by the Supreme Court of the United States and of Tennessee, "in language which admits of no other reasonable construction." The language of the 6th section of the act of 1785 certainly admits of a doubt, if it does not convey the idea, that it was only to exempt these lands from taxation while they were held ("vested") in the trustees for the "sole use and behoof of the Academy."

In 1836 suit was brought in the circuit court of Davidson county, by the *State of Tennessee* v. *Hicks, Ewing & Co.*, to recover the State tax alleged to be

due from the defendants as owners of the rolling mill adjoining the town of Nashville. The facts agreed upon by the parties were as follows: "That the land on which the rolling mill is located, is a part of the tract vested in the trustees of Davidson Academy and their successors in office, by the State of North Carolina, by an act of her Legislature, passed in 1785— then follows the 6th and 7th sections of the act of 1785 already cited. "The land thus vested was sold by the trustees of the University of Nashville (who succeeded to the rights of the trustees of Davidson Academy) to the defendants. The property when sold was represented as free from taxation." Upon these facts the circuit court rendered a judgment against the State, from which a writ of error was prosecuted to the Supreme Court of Tennessee. Judge Turley, who delivered the opinion of the supreme court in that case, says that: "In the year 1785, the State of North Carolina passed an act incorporating Davidson Academy, by the 7th section of which the two hundred and forty acres of land reserved for the use of the State, being that part of said land which is most remote from the salt-springs, near Nashville, was vested in the trustees for the use of the Academy; and by the 6th section of which the lands, tenements and hereditaments, vested in the trustees for the use and behoof of. the Academy are exempted from taxation for ninety-nine years." "The trustees of this Academy have at different times disposed of, by bargain and sale, portions of the land thus given to the Academy by the State of North Carolina, a part of which is

39—VOL. 8.

State *ex rel.* Gaines *v.* Whitworth.

now owned by the defendants in error, on which an *ad valorem* tax is now sought to be collected by the State. The question is, has this tax been laid on the land contrary to the provisions of the 6th section of said act of incorporation? It seems to us that there can be no doubt, from the wording of the 6th section of the act, that it was the intention of the Legislature to exempt the land from taxation absolutely for the term mentioned, no matter into whose hands soever it might come, for, by the provisions of the 2d section of the same act the trustees are empowered ' to sell any lands, etc.,' and if the Legislature had designed that the lands given by the State, or acquired from any other source, should only be exempt from taxation so long as they remained the property of the institution, and no longer, they would have so provided in express terms."

The able counsel for the plaintiff in error insists that this decision is "a *res judicata*" of the suit now before us. That the same questions involved in this suit were involved in the suit of the *State* v. *Hicks, Ewing & Co.* That "when a matter is once adjudicated, it is conclusively determined as between the same parties and their privies; and this determination is binding as an estoppel in all other actions, whether commenced before or after the action in which the adjudication was made:" Freeman on Judgments, sec. 249.

It is undoubtedly true, that the decision of the case in 9 Yerger is binding and conclusive upon the State, in all suits brought by the State against the same parties and their privies, involving the same

questions; and it is equally true that the same questions raised and involved in the decision of the suit of the *State* v. *Hicks, Ewing & Co.* are raised and involved in this suit; but as the defendant in this suit, or defendants (treating the trustee as a mere formal party, and the owners of the lots mentioned in the exhibits as the real defendants), are not in privity with Hicks, Ewing & Co., or were parties to that suit, and as each succeeding court can overrule its own decisions, it follows that they cannot rely upon and plead the decision of that suit in bar of this suit: 5 Sneed, 105; 12 Heis., 34; see also Cooley on Constitutional Limitations, pages 48–9 and note 1, and cases cited.

But this brings us to the consideration of the last and decisive question in the case—and that is, how far we are bound to respect that decision, or regard it as binding upon us, although we may not concur in its correctness. The case was decided in 1836. It was argued by George S. Yerger, attorney-general and reporter for the State, and by the Hons. W. A. Cook, E. H. Ewing and F. B. Fogg for the defendants—lawyers who at that time stood at the head of the bar in Tennessee, and it is no disparagement to the profession to say, that since that time they have had no superiors and but few equals. It was decided by a court which for many years adorned the supreme bench of Tennessee, and commanded the entire confidence of the profession, and of the citizens of the State. It was an agreed case, and doubtless made up that the important questions involved in it might be

finally settled. We cannot suppose that it was not ably argued, and fully and carefully investigated. The State, the county, and the city have acquiesced in it for over forty years. Upon its correctness capital has sought investment in that "territory," and built valuable improvements thereon. The petition makes a solemn admission that since 1836, "this decision has been treated by the profession as settling the question that this property was exempt for taxes for the State, county and city." It has to all intents and purposes become a rule of property, so far as a decision of the highest court in the State can make and establish that rule. While a court should not hesitate to overrule a decision which has been recently made, when fully convinced that it is erroneous, rather than perpetuate error, yet a very different principle prevails, when it has been acquiesced in for many years and established a rule of property. Judge Catron, in delivering the opinion of the court in the case of *Talbott* v. *McGavock, lessee,* 1 Yer., 277, referring to the decision of the court in the case of *Napier, lessee* v. *Simpson,* 1 Tenn. Rep., 447, says, "that he understood the bench and the bar, the Legislature and the community, to have acquiesced during the intermediate period of twenty years, in that decision, as being the law, and a correct construction of the act of 1797, and that with all possible deference to the opinion of others, it should not now be disturbed, independent of any doubts that might be entertained of its correctness."

In 1840, Judge Reese, in delivering the opinion of the court in the case of *Smith* v. *McCall's heirs,* 2 Hum.,

166, referring to the case of *Talbott* v. *McGavock*, says: " If we doubted, as we do not, the correctness of the judgment in that case, we should still yield to its authority.   A greater evil can scarcely be imagined than an habitual fluctuation in judicial opinion as to questions affecting the rights and regulating the conduct of a whole community in relation to real property."

In 1870, Judge Shields, a special judge, who delivered the opinion of the court in the case of *Sherfy* v. *David Argenbright, et al,* although overruling some decisions of the Supreme Court of Tennessee, made shortly after the close of the war, in relation to the validity of contracts founded upon Confederate Treasury notes, clearly recognizes the soundness of the law as held by Judges Catron and Reese, in this strong language: "When a decision, or a series of decisions, have established a rule of property, and more particularly, a rule affecting the title to real estate, which has become generally known, and been acted upon, such a land-mark should not be disturbed:" 1 Heis., 143.   See also, the opinions of Judge Whyte, in the case of *Nelson* v. *Allen*, 1 Yerg., 376.   The exceptions to the rule as thus established by the judicial decisions of the Supreme Court of Tennessee, may be found in the cases cited in the brief of counsel of *Vance* v. *McNairy*, 3 Yerg., 197, and of *Mitchell* v. *Lipe*, 8 Yerg., 179; but Judge Green, in delivering the opinion of the court in the case of 8 Yerger, overruling his opinion in the 3 Yerger case, says: " We feel the importance of adhering to former adju-

dications, and the mischief which result from a fluctuation of opinion on any question, yet questions will sometimes occur where a point may be adjudicated without the benefit of all the authorities which could shed light upon it, and when a consideration of it is highly proper." It is thus plainly seen that the reasoning of the learned judge, so far from forming a rule, intends to bring that case within an exception to what he acknowledges to be a sound and well established rule of law.

Chancellor Kent says: "If a decision has been made upon solemn argument and mature deliberation, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions and contracts by it. It is by the notoriety and stability of such rules that professional men can give safe advice to those who consult them, and people in general can venture to buy and trust, and to deal with each other. If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great land-marks of prosperity: 1 Kent, 415. Cooley, in his work on Constitutional Limitations, says: "It will, of course, sometimes happen, that a court will find a former decision so unfounded in law, so unreasonable in its deductions, or so mischievious in its consequences, as to feel compelled to disregard it. Before doing so, however, it will be well to consider whether the point involved is such as to have become a rule of property, so that titles have been acquired in reliance upon it, and vested rights will be disturbed

by any change; for in such case it may be better that the correction of the error be left to the Legislature, which can control its action so as to make it prospective only, and thus prevent unjust consequences:" Cooley on Con. Lim., 52. Judge Bronson, in the case of *Sparrow* v. *Kingsman*, 1 N. Y. Rep., says: "That after an erroneous decision touching the rights of property has been followed thirty or forty years, and even a much less time, the courts cannot retrace their steps without committing a new error nearly as great as the one at first." The construction given to a statute of a State by the highest judicial tribunal of such State, is regarded as a part of the statute: See 2 Black., 603, and a long list of authorities cited.

If, then, the exemption from taxation in the hands of purchasers from the trustee of the lands embraced within the grant of the two hundred and forty acres to the Academy in Davidson county, had been incorporated in the acts of 1785 and 1806, and the acceptance of these charters having been held a sufficient consideration to bind the States, neither a subsequent Legislature nor a Constitutional Convention, could pass any statute, or so amend the Constitution, so as "to impair that contract" or deprive them of those rights: See *University* v. *The People*, 9 Otto, 324.

The decision of the case of *The State* v. *Hicks, Ewing & Co.*, in 1836, settled in clear and unmistakable terms, that all the land included in this two hundred and forty acres, was exempt from all taxation in the hands of purchasers, for ninety-nine years from the date of the act in 1785. The legal pro-

fession, and the whole community have relied upon, and acted upon that construction of the statute. Believing, and having a right to believe, that the question was finally settled, they have invested their capital in the purchase of these lots, and built their homes upon them. Now to hold those lands liable for taxes, and possibly for back taxes, for may years, might bring ruin upon those families and confiscation of their property. But that would be the least of the evil consequences that would flow from such a decision. It would strike down all confidence in the stability of the judiciary, the last stay and hope of every community for the security and protection of their property.

Reverse the judgment of the Circuit Court and dismiss the petition with costs.

McFARLAND, J., delivered the following dissenting opinion:

I cannot concur in the conclusion reached by the opinion of the majority of the court. I am of opinion that the property in question should be held subject to taxation under the laws now in force. It is conceded that the town lots sought to be taxed are embraced within the two hundred and forty acre tract granted by the 7th section of the act of North Carolina of 1785, chartering Davidson Academy, to the trustees of said institution. It appears that parts of said tracts were, after the date of said charter, and pre-

vious to 1806, when Cumberland College was chartered,. sold by said trustees under the second section of the charter, giving them power to do so. All the property of Davidson Academy was, by the act of 1806, vested in the trustees of Cumberland College, and the charter of the former institution repealed.

This was done with the consent of the trustees of Davidson Academy, and no question can exist as to the validity of the act. The act, in terms, reserves to the trustees of Davidson Academy the right, and makes it their duty, to make conveyances for the lots of land previously sold by them, notwithstanding the repeal of the charter. The effect of the act of 1806, therefore, was to transfer to the trustees of Cumberland College all that, part of the two hundred and forty acre tract, which at the time, remained unsold. The present owners who derive their title through sales made by the trustees of Davidson Academy *previous* to 1806, claim their exemption by virtue of the 6th section of the charter of 1785, for ninety-years. Such as derive their title from sales made by the trustees. of Cumberland College, or its successor, *after* 1806, claim also the benefit of the exemption in the 9th section of the charter of 1806, which was perpetual.

The owners of the lots are not parties, but the trustee, in his answer or return to the suit, takes the position that the first named class are exempted for ninety-nine years, under the act of 1785, and that the last named class are entitled to a perpetual exemption. He says that his information is, that the greater part of the two hundred and forty acre tract, perhaps nearly

all of it, was sold and conveyed by said trustees of
Davidson Academy, prior to the year 1806, but else-
where, he says, "he does not know what portion of
the property *mentioned in the writ or petition* was sold
by Davidson Academy prior to 1806, or whether any
of it was so sold." There seems to be nothing else in
the record to show how this fact is. It seems to
me clear, that all those who claim · under pur-
·chases made from the trustees of Davidson Academy
prior to 1806, must stand alone upon the 6th section
·of the act of 1785; and this I believe is not con-
troverted. It seems to me, furthermore clear, that
those who claim under purchases made after 1806,
from the trustees of Cumberland College, must stand
alone upon the 9th section of the ‚charter of 1806,
and that they are not entitled to the benefits of the
exemption contained in the 6th section of the charter
·of 1785. It is claimed that the transfer of the prop-
erty of Davidson Academy to Cumberland College,
carried with it all the rights of exemption that at-
tached to the property in the hands of the first named
institution, *and this by mere force. of the act transferring
property without more.* But I think it is now re-
garded as well settled, that a mere purchaser or as-
signee of property, does not take the benefit of an
exemption to which the vendor or assignee of the prop-
·erty was entitled, and that this is so as to property
transferred by express legislative authority, unless the
Legislature assent to the exemption in favor of the
new owner—and this must be especially so where the
transfer was without consideration. This was settled

in the case of *Morgan* v. *Louisiana,* by the Supreme
Court of the United States, 3 Otto, and has been
since several times followed. So that upon the trans-
fer by the act of 1806, of the property of Davidson
Academy to Cumberland College, the latter institution
would not take the benefit of the exemption contained
in the former charter, unless the purpose to transfer
to the new institution the benefit, or the exemption
appear upon the face of the last named act. So far
from anything of this sort appearing, a contrary pur-
pose is in terms expressed. The act of 1806 con-
tains a new and independent exemption clause which
not only applies to any other property the new insti-
tution might acquire, but in terms applies to the
property which by the act was transferred to it. It
says, "*that* all property, real, personal or mixed, *by
this act appropriated and made over* to the use and
benefit of said College," * * as well as other prop-
erty afterwards acquired, etc., shall be exempt, etc.
So that it is clear the purpose was not to transfer to
the new institution the benefits of the exemption in
the old charter, but to grant a new and independent
exemption, and whatever right the new institution ac-
quired, was under this new exemption. In the case
of *The State* v. *Hicks, Ewing & Co.,* "that the Col-
lege succeeded to all the rights of the Academy," was
assumed as one of the *facts* admitted by the agreed
case, but was certainly not so determined by the court
upon consideration of the act itself; *for the opinion
shows that the land owned by the defendants in that
case had been sold off by the trustees of Davidson Acad-*

*emy.*   Hence, that decision only relates to that portion
of the two hundred and forty acres which had been
sold off previous to 1806.

It may seem that the real interest of such of the
property owners as hold under Cumberland College, is
not to claim exemption under the 6th section of the
charter of 1785, but rather under the 9th section of
the charter of 1806.   In the former, exemption is only
for ninety-nine years, while the latter is perpetual.
" *Curiously enough,*" however, the argument in favor
of the exemption has been rested alone upon the ex-
emption for ninety-nine years under the first charter,
while a strong inclination has been manifested to re-
pudiate the perpetual exemption in the last charter.
This was evidently from the consciousness that it was
dangerous to ask too much.   That the court might
sustain an exemption for ninety-nine years—which has
nearly expired—upon grounds that would not be suf-
ficient to sustain a perpetual exemption, though the
grant of the exemption be in equally strong terms.   I
am of opinion that if any of the owners of parts
of the two hundred and forty acres, who claim under
Cumberland College, have any exemption, it is not for
ninety-nine years—but perpetual.   For the grant of
exemption in the act of 1806, is equally as broad in
its terms as that of 1785, if a perpetual exemption
be valid; this seems to me to be beyond question.

But I am further of opinion that whether they
claim under Cumberland College or Davidson Acade-
my, that they are in no event entitled to the ex-
exmption.   That no such exemption, either under the

charter of 1785 or the charter of 1806, ought now to be allowed.     The determination of this question depends upon whether the case of *The State* v. *Hicks, Ewing & Co.*, 9 Yerg., 436, should now be followed or overruled.     I understand the court to be of the unanimous opinion the that case was wrongly decided. The question is, shall it nevertheless be now followed in consideration of the fact that it has been so long acquiesced in, and has become, so to speak, a rule of property relative to this two hundred and forty acres of land upon faith of which the present owners have acquired their title?

I do not understand that it is seriously contended that it is an *adjudication.*     It *was* an adjudication as to the right to recover the taxes claimed by the State for the year 1836, against so much of the property as was then owned by Hicks, Ewing & Co., but is no adjudication as to the right to recover the taxes now claimed: 5 Sneed, 106; 12 Hum., 34.     It *is* direct authority, however, deciding the direct question, especially as to the right of exemption of so much of the land as was sold off by the trustees of Davidson Academy—and as such, is entitled to the very highest consideration, and ought not to be overruled, except for the most cogent reasons.

The question was whether the exemption related only to the property in the hands of the Academy, or did it attach to the land itself, and follow it into whosoever hands it might come?     The court reached the latter conclusion.     The section of the charter (sec. 6), granting the exemption, is in these words: "That no

lands, tenements or hereditaments, which may be vested
in the trustees of the Acadamy of Davidson, for the
sole use and behoof of the Acedemy, shall be subject
to any tax for the space of ninety-nine years." The
grant of the two hundred and forty acres is contained
in the next section.

It will be observed that the exemption has no
special reference to the two hundred and forty acre
tract, but would apply as well to any other lands, the
title to which might become vested in the trustees for
the use of the Academy. In deciding that the ex-
emption attached to the land in the hands of a pur-
chaser, the entire opinion of the court, after stating
the facts, and the question raised, is as follows: "It
seems to me that there can be no doubt from the
wording of the 6th section of the act, that it was the
intention of the Legislature to exempt the land from
taxation, into whose hands soever it might come; for
by the second section of the same act, the trustees are
empowered to sell any land of the institution unless
the will of the grantee forbids it; and if the Legis-
lature had designed that lands given by the State, or
acquired from any other source, should only be exempt
from taxation so long as they remained the property
of the institution, and no longer, they would have so
provided in express terms. We therefore think the
tax imposed cannot be collected."

Thus it will be seen, that the decision was placed
upon the ground that as the language was susceptible
of two constructions, the court held that the exemption
attached to the land, because the act did not, in ex-

press terms, provide otherwise.    The principle of this decision is directly opposed to what is now the well settled rule, established by a long line of decisions by the Supreme Court of the United States, as well as by this court, made since the decision in 9th Yerger. That is to say, that no exemption can be claimed unless the Legislature's intent to grant it, appear beyond reasonable doubt; all presumptions are against the exemption and all doubts must be so resolved: *Hoge* v. *Railway*, 9 Otto, 354; 18 Wall., 225; 22 Wall., 498: Cooley on Taxation, 52; 7 Heis., 40, 389; 8 Heis., 388, 456, 663; 9 Heis., 349, and besides many other cases that might be cited. So, that if this were now an open question, no doubt can exist that the decision would be the other way, that is, that the exemption did not attach to the land in the hands of purchaser, but only in favor of the Academy. The conclusion would now be regarded as free from doubt. The question, therefore, is, admitting the decision to have been wrong, ought it nevertheless now to be followed upon the principle of *stare decisis.* This raises the question as to how and under what circumstances former decisions ought to be overruled.

It is, perhaps, almost superflous for me to express my great veneration for the distinguished court that decided the case of *The State* v. *Hicks, Ewing Co.*, or to say with what reluctance I venture to question its decisions.    But I am not at liberty for this or any other reason, to avoid the responsibility of forming my own opinion, and in all proper cases, re-examining the grounds upon which former decisions rest.    It is no

·disparagement to any court to say that they sometimes make decisions, which, upon reconsideration in the light of subsequent authority and reflection, are deemed erroneous. The question involved in the decision has become of vastly increased importance since that date.

As the demands of taxation have increased, attempts to avoid sharing its burdens, by claiming exemptions, have produced the numerous decisions to some of which we have referred, and most of which have been made since the case in 9 Yerger was decided, and in the light of these authorities, from our present standpoint, the decision cannot now be regarded as sound law.

I agree that former decisons should be overruled with great caution; and that there are many considerations to be weighed in favor of uniformity. A vascillating and conflicting course of decisions is greatly to be deprecated. It tends to weaken public confidence in the courts, and creates uncertainty and confusion in the law. But courts do not strengthen their claim to public confidence in all cases by adhering to erroneous decisions. Nevertheless, there are considerations on the other side of the question, and former decisions must sometimes be overruled; and notwitstanding the remarks so often made by our judges in favor of uniformity, yet our own reports contain, perhaps not less than fifty cases, that have been overruled. Some of them many years after they were rendered: See Overruled Cases, Kings Digest, 2d ed., vol. 3, sec. 3987.

At last it becomes a question for careful consideration, whether more injustice and greater confusion will

result from overruling an erroneous decision, than by following it. This is the question.

In all cases involving mere rules of property, as for instance, the construction of statutes or of writings, as in *Talbolt* v. *McGavock*, 1 Yerger, where there is generally no more real merit on the one side than the other, a decision, and especially a series of decisions once made, should be followed without question, for in such cases it is only necessary that there should be a uniform rule, and I agree that decisions of any character ought not to be overruled, when the question is merely doubtful. Decisions long acquiesced in, constituting rules of property or trade, applicable to the whole people of the State, ought not to be disturbed. But where the decision stands alone and unsupported, is manifestly erroneous, and where it involves palpable injustice and wrong, courts ought not to perpetuate the error and repeat the injustice, unless, as I have said, a greater injustice will result from an attempt to correct the error. Settled, uniform rules, are of the highest importance, yet it must not be overlooked that it is also the purpose of the law to administer right and justice in the particluar case. And that the rules established shall be such as will favor the right, and not continue to work injustice for all time to come. The decision in the present case, though made many years ago, is in no one sense a rule of property, or a rule of right applicable to the whole people of the State, and their property. It was not the construction of a section in a special charter, and applicable to the two hundred and forty acre tract of land referred to, and

upon the expiration of the period of exemption fixed by the decision, it would become a dead letter. It will not be insisted that the principle of the decision is to stand, that has long ago been overruled, and except as to the exemption of this particular property, it will no longer be authority.

It is true that it may fairly be supposed that pur-chasers of the property had notice of the decision, and that it affected the value of the property and the price paid for it; but it may also be assumed that they knew that courts sometimes' overrule their decisions, and that if they took legal advice, that they were most probably informed that the decision was, at least, a doubtful one. This they undertook to risk, and if the immunity which they have enjoyed up to the time this proceeding was instituted, is to remain undisturbed, they will certainly have but little cause to complain of bad faith in the exercise of the taxing power. That they have, under this decision, escaped taxation for more than forty years, will well repay the most of them. Overruling this decision will not disturb the rules of property and of right in regard to the people at large, or in regard to any matter except this particular property. In other respects the law will remain unchanged, and the evils pointed out in many cases, the result of conflicting decisions, will not occur. It is but a question whether greater injustice will result to these property owners, by overruling the decision and requiring them to pay taxes than by adhering to it. The property is represented to be in the heart of a growing city, and of

great value. The owners have the protection of the State, county and city governments, their streets are paved, they have the advantage of the police laws, schools, etc., and these burdens must all be borne by the other citizens, and these parties, so far as this property is concerned, be entirely exempt, and this too, when it is now, for the argument, conceded that if the laws had been rightly decided, they not only would not now be entitled to the exemption, but in fact, would have been required to pay taxes for more than forty years past, which they have entirely escaped. Under the decision they have unjustly avoided these parts of the public burdens chargeable to the property, since in 1836, and it is now insisted, that it will be greater injustice to require these property owners to pay their share of the taxes from now until the expiration of the ninety-nine years, than it will be to require the other property owners and citizens to continue as they have done, to pay it for them. In this I do not concur, I think the injustice is so palpable that the court ought not to be precluded by the one decision from deciding what but for the decision, would undoubtedly now be the law. As the period of ninety-nine years will soon expire, the question is of less practical importance than it would otherwise be. But suppose the exemption were to last for another hundred years, or the decision in 9th Yerger had sustained the *perpetual* exemption contained in the 9th section of the charter of 1806, as undoubtedly in principle it does, as to all property derived from Cumberland College, would the court then sustain it?

Would not the injustice of maintaining such an exemption, for all time to come, be so palpable as to constrain the court to overrule it? Would this one decision, then successfuly protect this property from its share of the public burdens? The principle is precisely the same, whether the exemption is to last two years or a hundred.

There is another view by which the same conclusion might probably be reached without overruling *The State* v. *Hicks, Ewing & Co.* That is, although this exemption is in a charter, it involves no element, or contract that ought to protect it from repeal. It does not appear that a dollar of private capital has been invested in the corporation upon the faith of the provisions of the charter, or otherwise. The grant of the exemption was purely gratuitous upon the part of the State. If repealable, the exemption was certainly repealed by the Constitution of 1870, expressly declaring all property taxable, with certain exceptions, which does not include this. But I need not pursue this subject.

There is only one consideration which would cause me to hesitate in declaring this property taxable, and that is the possibility that it might result that the property would be subject to back taxes without limit of time, and this I concede would be such an apparent hardship as probably to amount to greater wrong than to allow the exemption to continue to the end of the ninety-nine years, and if this question depended upon adopting one result or the other, I am not prepared to say that I would agree to a decision that

would practically confiscate the property. But it is only proposed to levy the tax for the present and the future, and I think safe ground could be found upon which to protect the property from the hardships of back taxes.

That the hardship of holding the property, liable for back taxes, should this far constrain the court to adhere to the erroneous decision, because hitherto acquiesced in, is not a sufficient reason for continuing the unjust exemption, merely in the effort to be logically consistent, especially when the effort would be a signal failure.

JUDGE FREEMAN concurs in this dissent.

MOTION TO REHEAR.

Upon motion to rehear, T. M. JONES, Special J., said:

We have had before us the application for a · rehearing in this case, and a majority of the court adheres to the opinion which they have heretofore announced.

We do not deem it necessary to review the argument, or .cite any additional authorities in support of the conclusion which we reached. Our opinion was based upon a solemn judicial construction of the contract of North Carolina, as to the grant of the two hundred and forty acres of land, in which the lots were sought to be taxed are located. That decision, in clear and unmistakable language, held that these

State *ex rel.* Gaines *v.* Whitworth.

lots' were exempt from all taxation for ninety-nine years, from the passage of the act of 1785, "into whose hands soever they might pass." That this decision had been acquiesced in by the State, county and city, for nearly half of a century. That the citizens relying upon, and having a right to rely upon this decision made by the Supreme Court of their own State, was a correct construction of the contract, had invested their capital in the purchase and improvement of the lots embraced within this two hundred and forty acre grant—they believed, and had a right to believe, that this construction of the statute of contract holding these lots to be exempt from taxation for ninety-nine years, formed a part of the statute or contract, and their rights having rested under it, no future Legislature, or even a Constitutional Convention, could impair those rights. Now to hold these lots, in the face of the decision of 1836, and the acquiescence of the State, county and city, ever since, not only for taxes for the present year, but for back taxes for over ninety years, if the Legislature of the State chose to enforce this collection, and which would be a complete confiscation of all of their lots, we hold would not only be unjust and a great wrong, but a violation of law and well settled principles of law. The exemption only extends for ninety-nine years from the passage of the statute of 1785, and only to those lots embraced within this two hundred and forty acre grant. This was the decision in 1836, and this is our decision now.

The application for a rehearing will be declined, and the petition dismissed.